## UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF PENNSYLVANIA

KEVIN JOHN BRADY,                    :

            Plaintiff        :        No. 3:15-CV-0477

     vs.                          :        (Judge Nealon)

CAROLYN W. COLVIN, Acting            :
Commissioner of Social Security,     :

           Defendant        :

**FILED**
**SCRANTON**

AUG 02 2016

PER _____
DEPUTY CLERK

## **MEMORANDUM**

On March 10, 2015, Plaintiff, Kevin John Brady, filed this instant appeal[1]
under 42 U.S.C. § 405(g) for review of the decision of the Commissioner of the
Social Security Administration ("SSA") denying his application for disability
insurance benefits ("DIB")  under Title II of the Social Security Act, 42 U.S.C. §
1461, et seq. (Doc. 1).  The parties have fully briefed the appeal.  For the reasons
set forth below, the decision of the Commissioner denying Plaintiff's application
for DIB will be vacated.

---

1. Under the Local Rules of Court "[a] civil action brought to review a decision of
the Social Security Administration denying a claim for social security disability
benefits" is "adjudicated as an appeal."  M.D. Pa. Local Rule 83.40.1.

## BACKGROUND

Plaintiff protectively filed[2] his application for DIB on March 5, 2012, alleging disability beginning on December 31, 2008 due to "back pain, leg cramps, fatigue, anxiety, and depression." (Tr. 16, 117, 139).[3] This claim was initially denied by the Bureau of Disability Determination ("BDD")[4] on June 18, 2012. (Tr. 16). On July 17, 2012, Plaintiff filed a written request for a hearing before an administrative law judge. (Tr. 16). An oral hearing was held on July 9, 2013, before administrative law judge Timothy Wing, ("ALJ"), at which Plaintiff and an impartial vocational expert, Josephine A. Doherty, ("VE"), testified. (Tr. 16). On July 17, 2013, the ALJ issued a decision denying Plaintiff's claims because, as will be explained in more detail infra, Plaintiff was capable of performing light work with limitations. (Tr. 13-25).

On September 13, 2013, Plaintiff filed a request for review with the Appeals

---

2. Protective filing is a term for the first time an individual contacts the Social Security Administration to file a claim for benefits. A protective filing date allows an individual to have an earlier application date than the date the application is actually signed.

3. References to "(Tr. _)" are to pages of the administrative record filed by Defendant as part of the Answer on May 21, 2015. (Doc. 10).

4. The Bureau of Disability Determination is an agency of the state which initially evaluates applications for disability insurance benefits on behalf of the Social Security Administration.

Council. (Tr. 11-12). On February 13, 2015, the Appeals Council concluded that there was no basis upon which to grant Plaintiff's request for review. (Tr. 1-7). Thus, the ALJ's decision stood as the final decision of the Commissioner.

Plaintiff filed the instant complaint on March 10, 2015. (Doc. 1). On May 21, 2015, Defendant filed an answer and transcript from the SSA proceedings. (Docs. 9 and 10). Plaintiff filed a brief in support of his complaint on June 20, 2015. (Doc. 11). Defendant filed a brief in opposition on July 23, 2015. (Doc. 13). Plaintiff filed a reply brief on July 28, 2015. (Doc. 14).

Plaintiff was born in the United States on June 22, 1960, and at all times relevant to this matter was considered a "individual closely approaching advanced age."[5]  (Tr. 135). Plaintiff obtained his high school diploma, and can communicate in English. (Tr. 138-139). His employment records indicate that he worked as a laborer. (Tr. 140). The records of the SSA reveal that Plaintiff had earnings in the years 1978 through 2005. (Tr. 126). His annual earnings range from a low of three thousand one hundred seventy-four dollars and sixty cents ($3,174.60) in 1978 to a high of thirty-one thousand three hundred eighty-seven

---

5. "Person closely approaching advanced age. If you are closely approaching advanced age (age 50-54), we will consider that your age along with a severe impairment(s) and limited work experience may seriously affect your ability to adjust to other work." 20 C.F.R. § 404.1563(d).

dollars and eighty-eight cents ($31,387.88) in 2002. (Tr. 126). His total earnings during these twenty-seven (27) years were three hundred sixty-nine thousand three hundred thirty-four dollars and ninety cents ($369,334.90). (Tr. 126).

In a document entitled "Function Report - Adult" filed with the SSA on April 27, 2012, Plaintiff indicated that he lived in a house with family. (Tr. 144). When asked how her illnesses, injuries, or conditions limited his ability to work, he stated that he could not lift more than ten (10) pounds; had days when he could not get out of bed because of back and leg pain; needed a cane to walk; could not sit or stand for more than fifteen (15) minutes; had depression and frequent anxiety attacks that he could not "get medication for;" and that his left leg would go numb which would cause him to fall. (Tr. 144). From the time he woke up until he went to bed, Plaintiff ate breakfast, read the paper, sometimes had friends pick him up for a visit, and would go to bed. (Tr. 145). Due to his illnesses, he could no longer work, play golf, hunt, hike, or have intercourse. (Tr. 145). In terms of self-care, Plaintiff had a walk-in shower, had no problems shaving or caring for his hair, could feed himself, used a shoe horn to get his shoes on, and had difficulty using the toilet. (Tr. 145). He did not prepare his own meals or drive, but did the laundry once a week for two (2) hours, shopped for clothing every couple of months. (Tr. 146-147). He was able to walk for one hundred

4

(100) yards before needing to rest for about ten (10) minutes, and used a cane for ambulation. (Tr. 149). When asked to check items which her "illnesses, injuries, or conditions affect," Plaintiff did not check squatting, reaching, kneeling, talking, hearing, seeing, memory, completing tasks, understanding, following instructions, using hands, or getting along with others. (Tr. 149).

Regarding concentration and memory, Plaintiff did not need special reminders to take care of his personal needs, but did need reminders to take his medicine. (Tr. 146). He could pay bills, handle a savings account, use a checkbook, and count change. (Tr. 147). He could pay attention for a "couple hours" on a good day, did not finish what he would start, had difficulty following written and spoken instructions because it was hard for him to concentrate on and remember them, did not handle stress well, and became angry with changes in routine. (Tr. 149-150).

Socially, Plaintiff would go outside on nice days. (Tr. 147). His hobbies and interests including reading everyday, playing cards weekly, and visiting friends twice a week, when he would "hang out in [a] hot tub [and] drink a couple beers." (Tr. 148). He went to church on a weekly basis and to any appointments he had at the Veterans' Affairs Office. (Tr. 148). He did not have problems getting along with family, friends, neighbors, or others. (Tr. 149).

Plaintiff also completed Supplemental Function Questionnaires for fatigue and pain. (Tr. 152). His fatigue started two (2) hours after waking up, had been the same since it began, was worse in the afternoon, and was not relieved by anything. (Tr. 152). His pain began in 2003 after lifting an object weighing seventy-five (75) pounds from a shelf, was located in his lower back with shooting pain and numbness down his legs bilaterally, worsened since it began, was constant, and was exacerbated by cold weather, bending, standing for more than a few minutes, walking, and using his legs to bend. (Tr. 153). He was unable to take narcotic pain prescriptions, and stated that over-the-counter medicine did not help. (Tr. 153).

At his oral hearing on July 9, 2013, Plaintiff testified that he was disabled due to a combination of impairments, including chronic low back pain that radiated into his lower extremities, cervical stenosis that caused a right arm radiculopathy, nerve damage in his left arm and wrist, depression, and anxiety. (Tr. 34). He testified that, due to back pain, the most he could walk was "just a couple of blocks at a time" before he would get shooting pain down his leg, and that he had been "severely limited" since his back surgeries. (Tr. 45-46). Plaintiff admitted that when he felt good, which mostly occurred when the weather was warm, he could walk one (1) mile a day. (Tr. 46). Plaintiff explained that he had

6

good and bad days, but more bad days than good. (Tr. 47). His weight lifting limit was ten (10) pounds in 2008, but at the time of the hearing, he needed help putting on his socks because he could not bend without needing help to get back up. (Tr. 48). He indicated that he had not driven in about seven (7) to eight (8) years, and that he could not sit in the car longer than a half hour without needing to stop and get out so he had not taken any long car trips. (Tr. 49-50). His back pain made sleep difficult, and he would wake three (3) to four (4) times a night. (Tr. 50). He would lie down between noon and one (1) in the afternoon because moving around and sitting to watch television gave him a backache. (Tr. 55). He stated that his pain was worse in 2008 than it was at the time of his hearing. (Tr. 56).

With regards to his left arm impairment, he testified that he had problems picking things up, grasping small objects like a zipper, and buttoning shirts and pants. (Tr. 54). He stated that he experienced arm numbness with shooting pain at times. (Tr. 52-53). He did have pain in his right arm as well, but it was not as bad as his left arm. (Tr. 53).

With regards to his mental health impairments, he testified that he had been hospitalized twice, and that he was currently taking Prozac for his depression. (Tr. 51). He testified that depression and narcotic medication addiction made it

7

difficult for him to focus on anything and to remember information. (Tr. 52).

## MEDICAL RECORDS

### I.    Physical Impairments

On February 24, 2005, Plaintiff had an appointment with Ibrahim M.

Almeky, M.D., for complaints of low back pain. (Tr. 1628). It was noted that he

had injured himself lifting a shelf at work two (2) years prior, and that he had been

receiving worker's compensation as a result. (Tr. 1628). It was also noted that he

had two (2) back surgeries that occurred in 2000 and 2004. (Tr. 1628). His

physical examination revealed: he was awake, alert, oriented, and in no distress;

no edema, cyanosis, or clubbing his extremities; and diffuse pain to palpation in

the lumbar region with reduced range of motion. (Tr. 1629). Dr. Almeky

offered to fill Plaintiff's prescriptions, but he declined because he received free

medication through worker's compensation. (Tr. 1629).

On November 17, 2005, Plaintiff had an appointment with Dr. Almeky for

continued complaints of low back pain. (Tr. 1616). Plaintiff rated his pain at a six

(6) out of ten (10); indicated that walking, sitting, standing, and cold weather

made the pain worse; that warm weather, Fentanyl, and lying down made it better;

and that there were no changes in his mental status or generalized weakness. (Tr.

1618). A physical examination was unchanged since February 2005, and Dr.

Almeky assessed Plaintiff with chronic low back pain status post-surgery in 2000 and 2004, directed Plaintiff to continue using Duragesic patches and Flexeril, and recommended that he limit his lifting and exertion. (Tr. 1618).

On February 9, 2006, Plaintiff had an appointment with Dr. Almeky, at which he noted that his medications were not as effective as they had been. (Tr. 1672). He rated his pain at seven (7) out of ten (10), and exhibited diffuse pain to palpation in the lumbar region with reduced range of motion. (Tr. 1673).

On March 10, 2006, Plaintiff had an appointment with Alexandria Alexis, M.D. (Tr. 1663). He reported that he did not like taking morphine, and on examination, he had a negative straight leg raising test with some tenderness in the paravertebral area of the lumbar spine. (Tr. 1663). Dr. Alexis recommended that Plaintiff taper off the morphine and apply heat to his lumbar region, and scheduled Plaintiff for an MRI. (Tr. 1664).

On March 24, 2006, Plaintiff underwent an MRI of his spine. (Tr. 1665). It revealed marrow edema with L4 vertebral body; moderate central and left-sided foraminal stenosis at L4-L5; a small left-sided lateral recess herniation superimposed on disc ridge complex; broad based right sided paracentral L5-S1 herniation displacement; and left-sided L4-L5 facet joint degenerative disc disease. (Tr. 1665). Dr. Alexis recommended that Plaintiff receive steroids for

the edema, and that he follow up with a neurosurgeon. (Tr. 1665).

On March 30, 2006, Plaintiff had an appointment with Dr. Almeky. (Tr. 1657). It was noted that Plaintiff had been tapering off morphine and had a May appointment in the pain management clinic. (Tr. 1657). Plaintiff's physical examination revealed: he was alert, oriented, and in no distress; no edema, cyanosis, or clubbing in his extremities; normal pedal pulses; and diffuse pain to palpation in the lumbar region with a reduced range of motion. (Tr. 1656). Dr. Almeky prescribed Percocet until Plaintiff could obtain a Fentanyl patch at the pain management clinic. (Tr. 1656).

On April 26, 2006, Plaintiff was examined by Katrina W. Harabin, M.D. (Tr. 1649). Plaintiff reported that before treating at the VA, he used Fentanyl patches for his back which "controlled his pain," that he did not want to take Morphine, and that Percocet did not help his pain. (Tr. 1649-50). After Plaintiff stated that he would prefer "just plain oxycodone, " Dr. Harabin prescribed a one (1) month supply. (Tr. 1650).

On May 12, 2006, B. Nakkache, M.D., evaluated Plaintiff and noted that a recent MRI revealed mostly degenerative joint disease and postoperative changes that were worse on the right side. (Tr. 1648-1649). Dr. Nakkache recommended that Plaintiff continue with conservative treatment. (Tr. 1649).

10

On June 1, 2006, Plaintiff had an appointment with Dr. Almeky, at which he reported that he felt much better since starting on a Fentanyl patch in May 2006. (Tr. 1638). Plaintiff's physical examination was normal. (Tr. 1639).

Medical records from Dr. Almeky's office indicate that between July and October 2006, Plaintiff regularly picked up his prescription for Fentanyl and "offered no complaint[s]." (Tr. 1636-37).

On January 4, 2007, Plaintiff had an appointment with Asma A. Shah, for chronic back pain. (Tr. 1732). Dr. Shah ordered anMRI and referred Plaintiff for a neurosurgery consult due to increased pain. (Tr. 1732).

On November 30, 2007, Plaintiff was examined by Andrew Fabian, M.D. (Tr. 1715). Plaintiff had no complaints and a normal physical examination. (Tr. 1715).

On April 14, 2008, Plaintiff had an appointment with Dr. Fabian. It was noted that Plaintiff had back pain that radiated to his legs at times without any parasthesias or weakness. (Tr. 1783). It was noted that Plaintiff did not show for the MRI that had been recommended. (Tr. 1785).

On May 9, 2008, Plaintiff had an appointment with Jennifer Borowski, Pharm. D., at which Plaintiff reported that he walked thirty (30) minutes a day (Tr. 1781).

11

On June 12, 2008, Plaintiff had an appointment with Dr. Borowski due to complaints of numbness in his left fourth and fifth fingers and right thumb. (Tr. 1772). On examination, Plaintiff had full range of motion in his neck with no spasms; no objective left arm numbness; a normal right arm; no objective abnormality of the thumb; flexion to 60 degrees in his back; could walk on his heels and toes; and had normal reflexes. (Tr. 1773).

A nerve conduction study from July 2008 was normal, and an electromyogram correlated only with a left C8 radiculopathy. (Tr. 1759, 1771). An MRI of Plaintiff's neck and cervical spine in July 2008 revealed an osteophyte complex (a small outgrowth of bone) at C5- C6 and C6-7 with mild to moderate spinal canal stenosis and neural foramina encroachment and C3-4 and C4-C5 uncovertebral joint hypertrophy with neural foramina encroachment. (Tr. 1835). An MRI of his lumbar spine revealed a broad based disc herniation at L5-S1 with neural foramina encroachment; a disc osteophyte complex at L4-L5 with facet hypertrophy and neural foramina encroachment; post-surgical changes at L4-L5; and diffuse annular disc bulges at L3-L4 with facet ligamentum flavum hypertrophy. (Tr. 1837).

On October 22, 2008, Plaintiff had an appointment with John P. Feerick, M.D., due to complaints of parasthesias and numbness in his fourth and fifth

12

fingers and left arm, and low back and leg pain. (Tr. 1748). It was noted that

testing and examinations revealed normal upper extremities; no reflex changes; a

negative straight leg raising test; no atrophy in the arms or weakness; and no focal

sensory loss or changes. (Tr. 1748-49). Dr. Feerick stated that Plaintiff could

should continue with conservative therapy with physical therapy, undergo a pain

evaluation, and attend a neurosurgical evaluation. (Tr. 1749).

On November 7, 2008, Plaintiff had an appointment with Dr. Iannuzzi for

chronic low back pain and episodic left shoulder pain. (Tr. 1743). On

examination, Plaintiff had: an appropriate affect; grossly intact cranial nerves; and

5/5 strength in his extremities. (Tr. 1744). Dr. Iannuzzi recommended Plaintiff

engage in a daily stretching and core routine to aid in his mobility. (Tr. 1744).

## II.   __Mental Impairments and Substance Abuse__

On November 22, 2005, Plaintiff had an appointment with Kevin Creegan,

Psy.D., after receiving an elevated score on a depression screening. (Tr. 1615).

Plaintiff's depression was described as episodic and mild to moderate in severity

and was referred to a psychiatrist. (Tr. 1615).

On January 19, 2006, Plaintiff was admitted for five (5) days in an inpatient

stay unit to detoxify from alcohol and prescription medications. (Tr. 1679, 1697-

98). On admission, Plaintiff was assessed with alcohol dependence and low back

pain and was assessed with a Global Assessment of Function ("GAF") score of forty-five (45). (Tr. 1698, 1701). During an examination on January 20, 2006, Plaintiff's exam revealed he: was clean and cooperative; had a low speech tone; had a blunted affect and depressed mood; was alert and clear; had a non-clinically impaired memory; had average intelligence; had limited insight with denial. (Tr. 1700-1701). Plaintiff was discharged on January 24, 2006, and a mental status examination revealed that he: was alert and oriented; maintained spontaneous, relevant, and coherent speech; had a neutral mood with no overt depression; was mildly anxious; and had an appropriate affect. (Tr. 1674).

A mental status examination from April 26, 2006, revealed that Plaintiff was alert and oriented; had spontaneous, relevant and coherent speech; exhibited a depressed mood, but an appropriate affect; no psychomotor retardation; no hallucinations or loosening of association; normal memory and judgment; and fair insight and motivation. (Tr. 1651).

On May 22, 2006, a psychiatric evaluation with Francisco Santos, M.D., in indicated that Plaintiff : was alert and oriented; was not nervous or as depressed; had a congruent mood with no psychotic symptoms; displayed intact remote and recent memory; and had fair judgment and insight. (Tr. 1642). Dr. Santos assessed Plaintiff with a GAF score of sixty (60). (Tr. 1642).

14

On February 7, 2007, Plaintiff had an appointment with Dr. Santos for a medication assessment. (Tr. 1730-1731). Plaintiff's exam indicated that he: was alert and oriented; exhibited a nervous mood and mild depression; had a congruent affect; exhibited no flight of ideations or psychiatric symptoms; had no suicidal or homicidal thinking; had intact recent and remote memory; and displayed fair judgment and insight. (Tr. 1731). Plaintiff reported that he had been having panic attacks, was not sleeping, worried "a lot," and felt tired. (Tr. 1730). Dr. Santos noted that Plaintiff had Depressive Disorder and Alcohol Dependence, and gave Plaintiff a GAF score of sixty (60). (Tr. 1731).

## STANDARD OF REVIEW

When considering a social security appeal, the court has plenary review of all legal issues decided by the Commissioner. See Poulos v. Commissioner of Social Security, 474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Commissioner of Social Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55 F.3d 857, 858 (3d Cir. 1995). However, the court's review of the Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether those findings are supported by "substantial evidence." Id.; Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993); Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988). Factual findings which are supported by substantial evidence must be upheld. 42

U.S.C. §405(g); <u>Fargnoli v. Massanari</u>, 247 F.3d 34, 38 (3d Cir. 2001) ("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently."); <u>Cotter v. Harris</u>, 642 F.2d 700, 704 (3d Cir. 1981) ("Findings of fact by the Secretary must be accepted as conclusive by a reviewing court if supported by substantial evidence."); <u>Mastro v. Apfel</u>, 270 F.3d 171, 176 (4th Cir. 2001); <u>Keefe v. Shalala</u>, 71 F.3d 1060, 1062 (2d Cir. 1995); <u>Martin v. Sullivan</u>, 894 F.2d 1520, 1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" <u>Pierce v. Underwood</u>, 487 U.S. 552, 565 (1988) (quoting <u>Consolidated Edison Co. v. N.L.R.B.</u>, 305 U.S. 197, 229 (1938)); <u>Johnson v. Commissioner of Social Security</u>, 529 F.3d 198, 200 (3d Cir. 2008); <u>Hartranft v. Apfel</u>, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance. <u>Brown</u>, 845 F.2d at 1213. In an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being

supported by substantial evidence." <u>Consolo v. Federal Maritime Commission</u>, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," <u>Cotter</u>, 642 F.2d at 706, and "must take into account whatever in the record fairly detracts from its weight." <u>Universal Camera Corp. v. N.L.R.B.</u>, 340 U.S. 474, 488 (1971). A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence. <u>Mason</u>, 994 F.2d at 1064. The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. <u>Johnson</u>, 529 F.3d at 203; <u>Cotter</u>, 642 F.2d at 706-07. Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole. <u>Smith v. Califano</u>, 637 F.2d 968, 970 (3d Cir. 1981); <u>Dobrowolsky v. Califano</u>, 606 F.2d 403, 407 (3d Cir. 1979).

## SEQUENTIAL EVALUATION PROCESS

To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 432(d)(1)(A). Further,

> [a]n individual shall be determined to be under a disability only
> if his physical or mental impairment or impairments are of such
> severity that he is not only unable to do his previous work but
> cannot, considering his age, education, and work experience,
> engage in any other kind of substantial gainful work which
> exists in the national economy, regardless of whether such
> work exists in the immediate area in which he lives, or whether
> a specific job vacancy exists for him, or whether he would be
> hired if he applied for work. For purposes of the preceding
> sentence (with respect to any individual), "work which exists in
> the national economy" means work which exists in significant
> numbers either in the region where such individual lives or in
> several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner uses a five-step process in evaluating disability and

claims for disability insurance benefits. See 20 C.F.R. § 404.1520; Poulos, 474

F.3d at 91-92. This process requires the Commissioner to consider, in sequence,

whether a claimant (1) is engaging in substantial gainful activity, (2) has an

impairment that is severe or a combination of impairments that is severe, (3) has

an impairment or combination of impairments that meets or equals the

requirements of a listed impairment, (4) has the residual functional capacity to

return to his or her past work and (5) if not, whether he or she can perform other

work in the national economy. Id. As part of step four, the Commissioner must

determine the claimant's residual functional capacity. Id. If the claimant has the

residual functional capacity to do his or her past relevant work, the claimant is not

disabled. Id. "The claimant bears the ultimate burden of establishing steps one through four." Residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. See Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996). A regular and continuing basis contemplates full-time employment and is defined as eight hours a day, five days per week or other similar schedule. The residual functional capacity assessment must include a discussion of the individual's abilities. Id.; 20 C.F.R. §§ 404.1545 and 416.945; Hartranft, 181 F.3d at 359 n.1 ("'Residual functional capacity' is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).").

"At step five, the burden of proof shifts to the Social Security Administration to show that the claimant is capable of performing other jobs existing in significant numbers in the national economy, considering the claimant's age, education, work experience, and residual functional capacity." Poulos, 474 F.3d at 92, citing Ramirez v. Barnhart, 372 F.3d 546, 550 (3d Cir. 2004).

**ALJ DECISION**

Initially, the ALJ determined that Plaintiff met the insured status

requirements of the Social Security Act through the date last insured of December

31, 2008. (Tr. 18).  At step one, the ALJ found that Plaintiff had not engaged in

substantial gainful work activity from her alleged onset date of December 31,

2008. (Tr. 18).

At step two, the ALJ determined that Plaintiff suffered from the severe[6]

combination of impairments of the following: "diabetes mellitus, lumbar and

cervical degenerative disc disease, depressive disorder, anxiety disorder,

alcohol/opioid dependence (20 C.F.R. 404.1520(c))." (Tr. 18).

At step three of the sequential evaluation process, the ALJ found that

Plaintiff did not have an impairment or combination of impairments that met or

medically equaled the listed impairments in 20 C.F.R. Part 404, Subpart P,

Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925

and 416.926). (Tr.19-20).

At step four, the ALJ determined that Plaintiff had the RFC to perform light

_____

6. An impairment is "severe" if it significantly limits an individual's ability to
perform basic work activities. 20 C.F.R. § 404.921. Basic work activities are the
abilities and aptitudes necessary to do most jobs, such as walking, standing,
sitting, lifting, pushing, seeing, hearing, speaking, and remembering. Id. An
impairment or combination of impairments is "not severe" when medical and other
evidence establish only a slight abnormality or a combination of slight
abnormalities that would have no more than a minimal effect on an individual's
ability to work. 20 C.F.R. § 416.921; Social Security Rulings 85-28, 96-3p and
96-4p.

work with limitations.  (Tr. 20-24).  Specifically, the ALJ stated the following:

> After careful consideration of the entire record, the undersigned
> finds that [Plaintiff] has the [RFC] to perform light work as
> defined in 20 CFR 404.1567(b). He was limited to no more
> than occasional postural maneuvers such as balancing,
> stooping, kneeling, crouching, and climbing on ramps and
> stairs, but he had to avoid occupations that required climbing
> on ladders. He was limited to no more than simple, routine,
> repetitive tasks not performed in a fast-paced production
> environment, involving only simple work-related decisions and
> few work place changes. He was limited to no more than
> occasional interaction with supervisors, co-workers, and
> members of the general public. Finally, he was limited to
> occupations that did not involve the handling, sale, or
> preparation of alcoholic beverages or access to narcotic drugs.

(Tr. 20).

At step five of the sequential evaluation process, considering Plaintiff's age,

education, work experience, and RFC, the ALJ determined "there are jobs that

exist in significant numbers in the national economy that the [Plaintiff] can

perform (20 C.F.R. 404.1569 and 404.1569(a))."  (Tr. 24).

Thus, the ALJ concluded that Plaintiff was not under a disability as defined

in the Social Security Act at any time between December 31, 2008, the alleged

onset date, and the date last insured, December 31, 2008.  (Tr. 25).

## DISCUSSION

On appeal, Plaintiff asserts the following arguments: (1) the ALJ's RFC

determination is flawed because the "record is devoid of any opinion on RFC from any physicians whatsoever," the ALJ improperly and unfairly found that Plaintiff did not have the limitations he alleged based on an unsupported negative inference, and the ALJ committed reversible error in failing to discuss Plaintiff's handling, fingering, and lifting limitations; (2) the ALJ failed to comply with Social Security Regulation ("SSR") 83-20 by failing to call on the services of a medical advisor for a retrospective opinion of Plaintiff's RFC; and (3) the ALJ erroneously evaluated Plaintiff's credibility and his subjective complaints of pain. (Doc. 11, pp. 6-24).  Defendant disputes these contentions.  (Doc. 13, pp. 16-36).

### 1.   RFC Determination

Plaintiff asserts that the ALJ's RFC assessment is not supported by substantial evidence as the "record is devoid of any opinion on RFC from any physicians whatsoever." (Doc. 11, p. 8-9).  The Court recognizes that the residual functional capacity assessment must be based on a consideration of all the evidence in the record, including the testimony of the claimant regarding her activities of daily living, medical records, lay evidence and evidence of pain. See Burnett v. Commissioner of Social Sec. Admin., 220 F.3d 112, 121-122 (3d Cir 2000).  However, rarely can a decision be made regarding a claimant's residual functional capacity without an assessment from a physician regarding the

22

functional abilities of the claimant.  See Doak v. Heckler, 790 F.2d 26, 29 (3d Cir.

1986) ("No physician suggested that the activity Doak could perform was

consistent with the definition of light work set forth in the regulations, and

therefore the ALJ's conclusion that he could is not supported by substantial

evidence."); 20 C.F.R. § 404.1545(a).

As two commentators have explained:

> Sometimes administrative law judges assert that they - and not
> physicians - have the right to make residual functional capacity
> determinations. In fact, it can reasonably be asserted that the
> ALJ has the right to determine whether a claimant can engage
> in sedentary, light, medium, or heavy work.  The ALJ should
> not assume that physicians know the Social Security
> Administration's definitions of those terms. However, the
> underlying determination is a medical determination, i.e., that
> the claimant can lift five, 20, 50, or 100 pounds, and can stand
> for 30 minutes, two hours, six hours, or eight hours. That
> determination must be made by a doctor. Once the doctor has
> determined how long the claimant can sit, stand or walk, and
> how much weight the claimant can lift and carry, then the ALJ,
> with the aid of a vocational expert if necessary, can translate
> that medical determination into a residual functional capacity
> determination.  Of course, in such a situation a residual
> functional capacity determination is merely a mechanical
> determination, because the regulations clearly and explicitly
> define the various types of work that can be performed by
> claimants, based upon their physical capacities.

Carolyn A. Kubitschek & Jon C. Dubin, Social Security Disability Law and

Procedure in Federal Courts, 287-88 (2011) (emphasis added); see also Woodford

v. Apfel, 93 F.Supp.2d 521, 529 (S.D.N.Y. 2000) ("An ALJ commits legal error

when he makes a residual functional capacity determination based on medical

reports that do not specifically explain the scope of claimant's work-related

capabilities."); Zorilla v. Chater, 915 F.Supp. 662, 667 (S.D.N.Y. 1996) ("The lay

evaluation of an ALJ is not sufficient evidence of the claimant's work capacity; an

explanation of the claimant's functional capacity from a doctor is required.").  The

administrative law judge cannot speculate as to a claimant's residual functional

capacity but must have medical evidence, and generally a medical opinion

regarding the functional capabilities of the claimant, supporting his determination.

Id.; see also Yanchick v. Astrue, Civil No. 10-1654, slip op. at 17-19 (M.D.Pa.

April 27, 2011) (Muir, J.) (Doc. 11); Coyne v. Astrue, Civil No. 10-1203, slip op.

at 8-9 (M.D.Pa. June 7, 2011) (Muir,J.) (Doc. 21); Crayton v. Astrue, Civil No. 10-

1265, slip op. at 38-39 (M.D.Pa. September 27, 2011) (Caputo, J.) (Doc. 17);

Dutton v. Astrue, Civil No. 10-2594, slip op. at 37-39(M.D.Pa. January 31, 2012)

(Munley, J.) (Doc. 14); Gunder v. Astrue, Civil No. 11-300, slip op. at 44-46

(M.D.Pa. February 15, 2012) (Conaboy, J.) (Doc. 10);[7] Wright v. Colvin, 2016

---

7. In Gunder Judge Conaboy reconciled the case of Chandler v. Commissioner of
Soc. Sec., 667 F.3d 356, 362 (3d Cir. 2011) with Doak v. Heckler, 790 F.2d 26,
29 (3d Cir.1986).  Judge Conaboy stated as follows:

   Any argument from the Commissioner that his administrative

U.S. Dist. LEXIS 14378, at *45-46 (M.D.Pa. Jan. 14, 2016) (Rambo, J.);[8] Ames v.

Astrue, Civil No. 3:11-CV-1775, slip op. at 55-58 (M.D.Pa. February 4, 2013).[9]

---

> law judges can set the residual function capacity in the absence
> of medical opinion or evidence must be rejected in light of
> Doak. Furthermore, any statement in Chandler which conflicts
> (or arguably conflicts) with Doak is *dicta* and must be
> disregarded. Government of Virgin Islands v. Mills, 634 F.3d
> 746, 750 (3d Cir. 2011)(a three member panel of the Court of
> Appeals cannot set aside or overrule a precedential opinion of a
> prior three member panel).

Slip op. at 45-46.

8. Judge Rambo also reconciled Doak with Chandler:

> Chandler stated that an ALJ need not obtain medical opinion
> evidence and was not bound by any treating source medical
> opinion. Id. However, both these statements are dicta. In
> Chandler, the ALJ had medical opinion evidence and there was
> no contrary treating source opinion. Id. '[D]ictum, unlike
> holding, does not have strength of a decision 'forged from
> actual experience by the hammer and anvil of litigation.' . . .
> the only precedential holding in Chandler is the unremarkable
> finding that an ALJ may rely on a state agency medical opinion
> that the claimant is not disabled when there are no medical
> opinions from treating sources that the claimant is disabled.
> See Chandler, 667 F.3d at 361-63 . . . . Consequently, with
> regard to lay reinterpretation of medical evidence,
> Frankenfield, Doak, Ferguson, Kent, Van Horn, Kelly, Rossi,
> Fowler and Gober continue to bind district Courts in the Third
> Circuit.

9. The Commissioner repeatedly opposes appeals in this Court where the ALJ's
decision relating to the claimant's residual functional capacity is defective because
of a lack of supporting medical opinion. This is likely because the Social Security

The Court's review of the administrative record reveals that the decision of the Commissioner is not supported by substantial evidence because the ALJ did not rely on a medical opinion in arriving at Plaintiff's RFC in violation of the principles outlined in Doak, but instead relied on his own lay reinterpretation of the medical evidence.  Therefore, pursuant to 42 U.S.C. § 405(g), remand is warranted, and this Court declines to address Plaintiff's remaining assertions.

## CONCLUSION

Based upon a thorough review of the evidence of record, it is determined that the Commissioner's decision is not supported by substantial evidence. Therefore, pursuant to 42 U.S.C. § 405(g), the appeal will be granted, the decision of the Commissioner will be vacated, and the matter will be remanded to the Commissioner of the Social Security Administration.

A separate Order will be issued.

Date: August 2, 2016

/s/ William J. Nealon
**United States District Judge**

---

Administration has a policy of nonacquiescence, i.e., the policy of not following precedents set by both District Courts and Courts of Appeals other than with respect to the claimant named in a particular decision.  See Office of Hearings and Appeals Handbook, § 1-161, quoted in Stieberger v. Heckler, 615 F.Supp. 1315 (S.D. N.Y. 1985), vacated, 801 f.2d 29 (2d Cir. 1986)("[W]here a district court or circuit court['s] decision contains interpretations of the law, regulations, or rulings [that] are inconsistent with the Secretary's interpretations, the [administrative law judges] should not consider such decisions binding on future cases simply because the case is not appealed.").